# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| **ROBERT SYLVESTER HEATLEY**, | CASE NO. 08cv0580-L(WMc) |
| Petitioner, | |
| vs. | **ORDER DENYING 28 U.S.C. § 2254 PETITION FOR WRIT OF HABEAS CORPUS** |
| **JAMES E. TILTON**, | |
| Respondent. | |

Petitioner Robert Sylvester Heatley ("Heatley"), a state prisoner incarcerated for life without the possibility of parole following his jury trial for first-degree felony murder, burglary, and robbery with use of a deadly weapon, seeks a 28 U.S.C. § 2254 writ of habeas corpus. Proceeding *pro se* and *in forma pauperis*, he challenges his conviction and sentence. He alleges three grounds for relief: (1) denial of a fair trial for the court's failure to give *sua sponte* a jury instruction on a "claim of right" defense; (2) the court applied the wrong standard in denying his motion for a new trial; and (3) an excessive restitution fine imposed in violation of the Eighth Amendment. Respondent filed an Answer,[1] and Heatley filed a Traverse. After careful consideration of the record, the parties' arguments, and pertinent legal authority, for the reasons discussed below, the Petition is **DENIED**.

## I.    BACKGROUND

### A.    Factual Background

Federal courts presume the correctness of a state court's determination of factual issues, and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing

---

[1] The Answer is filed on behalf of Larry Small, Warden of Calipatria State Prison, Heatley's current custodian, rather than named Respondent James E. Tilton, California Department of Corrections secretary. The party substitution is authorized by FED.R.CIV.P. 25(d).

evidence." 28 U.S.C. § 2254(e)(1). The parties do not dispute the Court of Appeal's findings in affirming Heatley's conviction and sentence, reproduced *verbatim* in Respondent's Answer. (Answer pp. 5-7; Lodg. 4, pp. 2-7.)

As pertinent here, Heatley admitted he struck victim Kevin James Clindinin ("Clindinin") in the head with an axe handle on April 2, 2001, as he came out of his bedroom while Heatley and an acquaintance, co-defendant Gloria Talada ("Talada"), along with others, were inside Clindinin's apartment uninvited to take away some property. Clindinin had previously referred to Talada as his girlfriend in a conversation with the apartment manager, who believed Talada to be a prostitute. The apartment did not bear signs of forced entry. A maintenance worker found Clindinin lying dead in his kitchen, his face and hair bloodied. Clindinin was nude, but with a comforter and sheet wrapped around his legs. His left calf and left wrist were tied together with nylon rope, and a small bloodied fire extinguisher lay partially beneath his body. Blood smears were evident throughout the apartment, with blood spatter on the living room walls. Furniture and a lamp were overturned, papers were scattered, and the bedroom dresser drawers were pulled out, their contents dumped. Clindinin's stereo, a television, and 150 to 200 compact discs were missing. The autopsy indicated he had probably died one or two days before his body was discovered. The cause of death was brain injury caused by a blow from a hard object, such as an axe handle, to the right side of his head. He also had multiple contusions on his head, chest, abdomen, and arms, with lacerations on his head, left ear, and the bridge of his nose. (Lodg. 4.) "A latent fingerprint from a beer can found in the kitchen trash matched to [Heatley]. A latent fingerprint found on a vertical blind in the bedroom was matched to Talada. Paperwork belonging to [Heatley] was found in Clindinin's vehicle." (Lodg. 4, p. 3.)

A few days before Clindinin's death, the resident of another apartment in the same complex, Joseph Sutton, had been evicted, but many people, including Heatley and Talada, continued to congregate there for illegal drug use. (Lodg. 4.)

[Petitioner] was interviewed by Fresno Police Detective Robert Schiotis on September 18 [, 2001]. During this interview, he admitted entering Clindinin's apartment with Talada and two men he referred to as Calvin and J.C. He also admitted hitting Clindinin one time on the head with an ax handle.

Initially, [Petitioner] told Detective Schiotis that he entered Clindinin's apartment to help Talada move her things to Sutton's

apartment. Later during the interview, [Petitioner] admitted the group went to Clindinin's apartment to "rip him off." They were going to "sell the stuff and get some dope." [Petitioner] agreed to participate because Talada told him there was money and dope in the apartment. [Petitioner] said, "[P]art of the reason we went in there, when they went in there, was because he was supposed to, [Talada] said he had some money." Talada previously stole Clindinin's car and his checkbook on prior occasions. [Petitioner] said Talada "knew everything about him. She had ripped him off so many times. She would never do him right."

Talada told [Petitioner] she had already put Clindinin to sleep and she needed some help moving the stuff out. She said Clindinin was "passed out drunk and on them pills." She also told him that "everything was bagged up." However, Clindinin unexpectedly woke up when the quartet entered his apartment and walked out of his bedroom. Heatley hit Clindinin on the head one time with an axe handle he had in his hand.FN3 Clindinin fell to the ground. The others wrapped a towel around his head "so he couldn't holler if he woke up." [Petitioner] said he hit Clindinin "[b]ecause I didn't want him to see me. I didn't want to go to jail, and when he came out, he sounded like he was pissed. [Clindinin's] a big guy."

> FN3. [Petitioner] gave inconsistent information about the axe handle. First, he said everyone was armed with "something" when they entered the apartment as "a precaution." However, someone else brought the axe handle. Later, [Petitioner] said he found the axe handle in Clindinin's apartment by the door.

[Petitioner] said he fled the apartment after he hit Clindinin because he was scared. However, after he was told Clindinin was "knocked out" he returned to the apartment. [Petitioner] grabbed two bags of "stuff" and took them to Sutton's apartment while the others looked for the keys to Clindinin's truck. At this point, "[a]ll kinds of people were going in [Clindinin's apartment]." These people included men named "Mark" and "Ron." Mark left to sell the things that were taken from Clindinin's apartment. Talada brought [Petitioner] some money and they left to buy some drugs. [Petitioner] said he "felt bad about taking [Clindinin's] stuff, but [Clindinin] used to brag about every time [Talada] got him, he got better stuff back from the insurance, you know."

(Answer pp. 5-6; Lodg. 4 pp. 3-4.)

At trial, prosecution witness Mark Blueian testified he went to Sutton's apartment the evening of April 2, 2001 to obtain some drugs. Heatley, Talada, and two men known to Blueian as Calvin and J.C. were there. He overheard Heatley and Calvin talking about going to an apartment to "do a hustle," with one planning to act like a drug dealer and the other like a robber to steal from the victim.

> Bleuian [*sic*] said he left Sutton's apartment with [Petitioner], Talada and Calvin. [Petitioner] was carrying a long round object that

was wrapped in a sheet or some other fabric. Bleuian followed the trio until they were in a courtyard about five feet away from Clindinin's patio enclosure. Bleuian remained outside. He heard someone cry out, "Help me. Help me." Immediately afterward he heard a loud noise that sounded "like when somebody is playing baseball and they hit a ball, like a thump."

Bleuian returned to Sutton's apartment. [Petitioner], Calvin and Talada arrived about 30 minutes after Bleuian heard the cry for help. Talada was carrying two pillow cases full of personal property, including compact discs, frozen TV dinners and a credit card. Bleuian put some of the dinners in the oven to cook. Talada left Sutton's apartment again but quickly returned with some stereo speakers.

[Petitioner] told Bleuian that he had "snuffed" or wasted someone. [Petitioner] asked Bleuian to help him steal a big-screen television from Clindinin's apartment. Bleuian refused. He did not want to take part in the crime so he left Sutton's apartment. While he was in the parking lot he saw [Petitioner] and some other people trying to break into a pickup truck. He heard [Petitioner] say he did not want to go to prison and that his identification was inside the vehicle.

When Bleuian reached his home, he called Crime Stoppers and anonymously reported that someone had been killed. He called Crime Stoppers again sometime in the following three or four days. He did not receive any reward money for this tip.

(Answer pp. 6-7; Lodg. 4, p. 5.)

The witnesses for the defense were a forensic toxicologist, Detective Christian Curtice, and Heatley himself.

Detective Curtice testified that he was informed on July 23 that Bleuian wanted to speak with him about an unsolved homicide. Bleuian told Detective Curtice about hearing someone cry for help. He also told the detective that Talada came back from another apartment with some stereo equipment. Bleuian reported that [Petitioner] said to him, "I think I killed that guy." Bleuian said he got scared, went home and reported the incident to Crime Stoppers. He then returned to Sutton's apartment. Talada, Calvin and J.R. were present. Bleuian said Talada asked him to move a big-screen television. He returned home and contacted Crime Stoppers a second time. Bleuian said he did not go into the other apartment or take any property.

[Petitioner] testified that he did not intend to steal from Clindinin. [Petitioner] also denied bringing an implement such as an axe handle to the apartment. Finally, he denied telling Bleuian that he had killed someone.

[Petitioner] testified that he was at Sutton's apartment on the night of the homicide ingesting crack cocaine. Talada asked him to help her remove her things from Clindinin's apartment. [Petitioner] asked Talada if this was okay with Clindinin. Talada said Clindinin was drunk and passed out. She said everything was ready to go and she wanted to get it all at once. [Petitioner] agreed to help Talada because

- 4 -

she told him Clindinin had money in the apartment and she promised to take the money and use it to buy [Petitioner] some drugs.

[Petitioner], Talada, Calvin and some others went to Clindinin's apartment. Bleuian was part of the group that went to the apartment, but [Petitioner] does not know if Bleuian went inside. When [Petitioner] entered Clindinin's apartment he saw some items bagged in the middle of the living room, including some things in pillowcases. Seconds after entering the apartment, someone knocked over a lamp. Clindinin came out of the bedroom. [Petitioner] grabbed a stick that was by the front door and hit Clindinin on the head. Clindinin said, "Ouch," and fell down. He dropped the stick and left the apartment. He did not hear anyone hitting Clindinin but did hear someone say to gag him. Talada came outside and handed him two pillowcases of items. He did not open them up. He assumed they contained Talada's property. He brought the bags to Sutton's apartment and left.

(Answer p. 7; Lodg. 4, pp. 6-7.)

## B. **Procedural History**

A First Amended Felony Complaint filed in Fresno County Superior Court, Central Division, Case No. F01911810-0, charged Heatley and Talada in Count 1 with murder using a deadly and dangerous blunt object weapon during the commission of a residential robbery.[2] (CT[3] 003, 007.) A Second Amended Felony Complaint, filed February 8, 2002, added a Count 2 charge of felony murder during the commission of a residential burglary. (CT 008-010.) The defendants were tried separately.

Heatley's twelve-day trial ended July 22, 2004. (CT 418.) The jury deliberated two days before convicting him on July 26, 2004 of first degree murder (CAL. PEN. CODE § 187(a)) with a true finding he personally used a deadly and dangerous weapon (CAL. PEN. CODE § 12022(b)(1)), a true finding of the Special Circumstance the murder was committed while he "was engaged in the commission and attempted commission of the crime of Robbery, within the meaning of CAL. PEN. CODE § 190.2(a)(17)," and a true finding of the Special Circumstance the murder was committed while he "was engaged in the commission and attempted commission of the crime of Residential Burglary, within the meaning of CAL. PEN. CODE § 190.2(a)(17)." (CT 612-613.)

On August 16, 2004, Heatley moved for a new trial or to modify the verdict, arguing the

---

[2] The Lodgements and Reporter's Transcript ("RT") identify the case number as F01670504-0. The Court of Appeal case number is F046409.

[3] "CT" refers to the lodged Clerk's Transcript.

evidence was insufficient to convict him of felony murder.  He cited CAL. PEN. CODE § 1181(6), requiring trial courts to independently review the evidence to ensure the defendant received due process.  (CT 614-617.)  On September 15, 2004, the court denied the motion, sentenced him to life in prison without the possibility of parole, and imposed the statutory maximum $10,000 Restitution Fine payable to the state pursuant to CAL. PEN. CODE § 1202.4(b), plus a payment of $2,707.11 to the victim compensation Restitution Fund pursuant to CAL. PEN. CODE § 1202.4(f).[4]  (CT 629-31.)

Heatley appealed on March 22, 2005, arguing the trial court erred in failing to instruct the jury on the defense of "claim of right" and applied a "wrong standard" in denying his motion for a new trial.  (Lodg. 1.)  In a February 9, 2006 unpublished opinion, the Court of Appeal rejected his arguments on the merits and affirmed the judgment.  (Lodg. 4.)  Heatley petitioned the California Supreme Court for review on March 15, 2006, a request summarily denied on April 19, 2006 without citation to authority.  (Lodgs. 5, 6.)  Proceeding *pro se*, Heatley executed, served, and filed by mail a verified Petition For Writ Of Habeas Corpus in Fresno County Superior Court on April 19, 2007.  (Lodg. 7.)  He alleged only a violation of the Eighth Amendment:  "The trial court imposed an excessive fine due to Petitioner's indigent status and failed to justify upward departure from statutory $200.00 minimum and allow hearing as to 'compelling and extraordinary' reasons to dispense with restitution."  (Lodg. 7; Pet. p. 3.)  In a reasoned decision filed May 21, 2007, the Superior Court denied the petition.  (Lodg. 8.)  On July 20, 2007, Heatley sought habeas relief from Court of Appeal on the restitution portion of his sentence, summarily denied on July 30, 2007.  (Lodgs 9, 10.)  He raised the same issue in a habeas petition to the California Supreme Court on September 6, 2007, summarily denied on March 12, 2008.  (Lodgs. 11, 12.)

Heatley filed his federal habeas petition on April 8, 2008, but in the wrong division of the Eastern District of California, together with a request to proceed *in forma pauperis*.  By Interdistrict Transfer Order entered April 28, 2008, the Sacramento Division transferred the matter to the Fresno Division, noting the transferring court "will not rule on petitioner's request to proceed in forma

---

[4]  ". . . [I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. . . ."  CAL. PEN. CODE § 1202.4(f).

pauperis." (Dkt No. 6, 1:24, 2:2.) By Order entered July 8, 2008, the Fresno Division issued a briefing schedule and instructed the Clerk of Court to serve the documents, without ruling on the *in forma pauperis* request. This Court construes that Order as a *de facto* grant of the request. (Dkt No. 6.) On November 25, 2008, this matter was reassigned from the bench of the United States District Court for the Eastern District of California to visiting District Judge M. James Lorenz, United States District Court for the Southern District of California. (Dkt No. 14.) The case became fully briefed on January 15, 2009 with the filing of Heatley's Traverse. (Lodg. 18.) There is no dispute the claims are exhausted and his federal Petition was timely filed.

## II. DISCUSSION

### A. Legal Standards

#### 1. Federal Habeas Review

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254(a) (West 2006). Only errors of federal law can support federal intervention in state court proceedings, and only to correct such errors. Oxborrow v. Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989). Federal habeas courts are bound by states' interpretations of their own laws. Himes v. Thompson, 336 F.3d 848, 852 (9th Cir. 2003); Estelle v. McGuire, 502 U.S. 62, 68 (1991).

Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA establishes a "highly deferential standard for evaluating state-court rulings." Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (citation omitted).

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to **any claim that was adjudicated on the merits** in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was **contrary to, or involved an unreasonable application of, clearly established Federal law**, as determined by the Supreme Court of the United States; **or**
>
> (2) resulted in a decision that was based on an **unreasonable determination of the facts** in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

" '[C]learly established Federal law . . . refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.' " Carey v. Musladin, 549 U.S. 70, 74 (2006), *quoting* Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000) (the lack of a United States Supreme Court holding on an issue precludes federal habeas relief); *see also* Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003); Bell v. Cone, 535 U.S. 685, 694 (2002) (distinguishing the "contrary to" and the "unreasonable application" clauses, with the latter requiring a finding of objective unreasonableness, not mere incorrectness). The denial of a petition by the state's highest court "without comment or citation constitute[s] a decision on the merits of the federal claims," and "such claims [are] subject to review in federal habeas proceedings." Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992). When there is no reasoned decision from the state's highest court, the federal court "looks through" to the rationale of the underlying decision. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground").

## 2. **Evidentiary Hearings**

Heatley asks for an evidentiary hearing. AEDPA "now substantially restricts the district court's discretion to grant an evidentiary hearing." Baja v. Ducharme, 187 F.3d 1075, 1077 (9th Cir. 1999).

> (e) (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court ***shall not hold*** an evidentiary hearing on the claim ***unless*** the applicant shows that—
>
> (A) the claim relies on—
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; **or**
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; **and**
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e) (West 2006) (emphasis added); *see* Bragg v. Galaza, 242 F.3d 1082, 1085, 1089-90 (9th Cir. 2001); Baja, 187 F.3d at 1078.

- 8 -

Thus, "a district court presented with a request for an evidentiary hearing . . . must determine whether a factual basis exists in the record to support the petitioner's claim." Baja, 187 F.3d at 1078. If no factual basis exists in the record, "and an evidentiary hearing might be appropriate," the federal court then determines whether the petitioner "failed to develop the factual basis of a claim in State court." Id., *quoting* Cardwell v. Greene, 152 F.3d 331, 337 (4th Cir. 1998) (*quoting* 28 U.S.C. § 2254(e)). If the petitioner failed to develop the claim's factual basis in state court, the request must be denied unless he or she establishes one of the codified exceptions. Baja, 187 F.3d at 1078. Finally, if an exception applies, the new facts asserted, if proven, must entitle the petitioner to relief. Id. at 1078-79; *see* Williams (Michael) v. Taylor, 529 U.S. 420 (2000). "[A]n evidentiary hearing is not required on allegations that are 'conclusory and wholly devoid of specifics.' " Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994) (citation omitted). "Nor is an evidentiary hearing required on issues that can be resolved by reference to the state court record." Id. (citation omitted); *see* Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998). Heatley relies on pre-AEDPA standards and authority in support of his request. (Traverse pp. 6-7.)

With respect to his Ground One claim the trial court should have instructed the jury *sua sponte* on the defense of claim of right, he seeks a hearing to demonstrate evidence supported giving the instruction and to "resolve any 'sufficiency' issues." (Traverse p. 16.) The Court rejects that request. Among other things, as discussed below, no factual basis exists in the record to support the defense. Campbell, 18 F.3d at 679. His allegations are entirely conclusory, his failure to develop the factual record on this claim does not fall within one of the codified exceptions, and "the issues can be resolved by reference to the state court record," foreclosing an evidentiary hearing under AEDPA standards. Id.; *see* Baja, 187 F.3d at 1078).

With respect to his Ground Three excessive fines claim, he asks for a hearing because the "facts noted in Petitioner's California State Supreme Court Habeas Corpus [petition] were not known to him at the time of sentencing," and "an evidentiary hearing must be allowed by this court to substantiate the claim." (Traverse 21:2-6.) The Court rejects that request. As discussed below, he raises no federal constitutional concern, the identified facts, if proven, would not entitle him to relief, and the issue can be resolved as a matter of law, among other things. *See* CAL. PEN. CODE § 1202.4.

AEDPA does not authorize this Court to conduct any evidentiary hearing in these circumstances. *See* 28 U.S.C.A. § 2254(e). Accordingly, the requests are **DENIED**.

### B. Merits

#### 1. Ground One: Instructional Error

An error in a trial proceeding must be one involving "fundamental fairness" to constitute a due process violation. Estelle, 502 U.S. at 73; *see* Calderon v. Coleman, 525 U.S. 141, 145 (1998) ("a federal court may grant habeas relief based on trial error only when that error 'had substantial and injurious effect or influence in determining the jury's verdict' "), *quoting* Brecht v. Abrahamson, 507 U.S. 619, 637, 638 (1993); *see, e.g.,* Murtishaw v. Woodford, 255 F.3d 926, 971-972 (9th Cir. 2001) (due process violation found in capital case where petitioner demonstrated instructing the jury on the wrong version of a statute reduced the jury's discretion in selection of the death penalty). As pertinent here, the fundamental fairness standard in the jury instruction context requires that criminal defendants be afforded a meaningful opportunity to present a complete defense. California v. Trombetta, 467 U.S. 479, 485 (1984); Mathews v. United States, 485 U.S. 58, 63 (1988) ("As a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor"); *see* Bradley v. Duncan, 315 F.3d 1091, 1096, 1098-99 (9th Cir. 2002) ("the state court's failure to correctly instruct the jury on [a] defense may deprive the defendant of his due process right to present a defense," and "[d]oubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused") (citation omitted).

To satisfy due process, Heatley argues the trial court should have *sua sponte* instructed the jury with California's "claim of right" defense[5] "under the limited theory of Third Party Claim of

---

[5] "CALJIC 9.44 Robbery. . . Defense of Claim of Right: An essential element of the crime of [robbery] . . . is a specific intent permanently to deprive the alleged victim of his or her property. That specific intent does not exist if the alleged perpetrator had a good faith claim of right to title or ownership of the specific property taken from the alleged victim. **In other words, if a *perpetrator* seeks to regain possession of property in which [he] [she] honestly believes [he] [she] *has a good faith claim of ownership or title*, then [he] [she] does not have the required criminal intent**. . . . . [¶] If, after a consideration of all the evidence, you have a reasonable doubt that [defendant] [perpetrator] possessed the required specific intent, you must find [him] [her] not guilty of the crime[s] of [robbery]. . . ." (emphasis added).

Right." (Traverse 11:14-24; Pet. p. 5.) Defense counsel requested no such instruction.[6] Heatley substantiates no recognized "third party claim of right" defense nor standard instruction on such a theory, but contends he was denied due process and a fair trial under the Sixth and Fourteenth Amendments for failure of the trial court to *sua sponte* provide the jury with a "claim of right" instruction. (Pet. p. 5.) When the issue is the failure to give an instruction, the petitioner's burden is "especially heavy" because "[a]n omission or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977); Murtishaw, 255 F.3d at 971-972; *see* Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir.1997), *quoting* Henderson, 431 U.S. at 155 (the burden of demonstrating prejudicial instructional error "in a collateral attack on the constitutionality of a state court's judgment is even greater than the showing required to establish plain error on direct appeal"). "A defendant is entitled to an instruction on his theory of the case 'provided that it is supported by law and has some foundation in evidence.' " United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir.1996) (citation omitted); *see* Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir.1995) ("Whether a constitutional violation has occurred will depend on the evidence in the case and the overall instructions given to the jury"), *citing* Cupp v. Naughten, 414 U.S. 141, 147 (1973).

Federal habeas relief is available only when " 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' " Estelle, 502 U.S. at 72, *quoting* Cupp, 414 U.S. at 147. To make that determination, courts must examine the adequacy of the instructions in their totality as actually given. Henderson, 431 U.S. at 154, 156; *see* Estelle, 502 U.S. at 72; As pertinent here, a defendant receives due process as long as the trial judge gives jury instructions that adequately convey the defendant's theory of the case. United States v. Romm, 455 F.3d 990, 1002 (9th Cir.2006); United States v. Mason, 902 F.2d 1434, 1438 (9th Cir.1990) (even if an instruction was requested and rejected by the trial court, "it is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory"); *see* United States v. Tsinnijinnie, 601 F.2d 1035, 1040 (9th Cir. 1979).

Heatley's defense theory was that he entered Clindinin's apartment to help Talada retrieve her

---

[6]  In his direct appeal, Heatley had included a claim of ineffective assistance of counsel based on counsel's failure to request the instruction. (Lodg. 1, pp. 24-25.) He does not pursue that claim here.

belongings, not for any felonious purpose.

> Petitioner believed that he was assisting a friend in the recovery of property wrongfully held and in the possession of another. Petitioner did not intend to cause or participate in actions leading to the death of the person whom he believed to be wrongfully in possession of his friend[']s property. Petitioner was charged with first degree murder without benefit of this crucial instruction.

(Pet. p. 5.)

The only murder theory argued to the jury was felony murder. The only criminal intent required to prove felony murder is the specific intent to commit the particular underlying felony during the course of which a killing occurred. People v. Chavez, 118 Cal.App.4th 379, 385 (2004) ("Under the felony-murder rule, a killing, whether intentional or unintentional, is first degree murder if committed in the perpetration of, or the attempt to perpetrate, certain serious felonies") (citation omitted). Heatley argues he lacked the requisite criminal intent to commit burglary or robbery, relying solely on his own trial testimony explaining why he was in Clindinin's apartment at the time, evidence he presented to the jury and which the jury manifestly rejected. From that premise, he extrapolates prejudice on the tenuous ground omission of a "claim of right" instruction "preclud[ed] the necessary theory of 'Imperfect Third Party Defense of Others,' " another instruction neither requested at trial nor supported by citation to any authority. (Traverse 11:7-17.) He pursues his speculation even more remotely to argue absent a claim of right instruction and a third party claim of right instruction, he "had no chance at requesting the equally necessary CALJIC 5.17 as to self-defense" or an instruction on "imperfect self-defense."[7]  (Traverse 12:16-20.)  He argues had the claim of right defense been given as "required," the jury could have entertained reasonable doubt he had the necessary state of mind for robbery and burglary, and he could then have possibly prevailed if they also believed he

---

[7]  "CALJIC 5.17 Actual But Unreasonable Belief in Necessity to Defend—Manslaughter. . . .[¶] A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of [voluntary] [or] [involuntary] manslaughter.  [¶] As used in this instruction, an 'imminent' [peril] [or] [danger] means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.  [¶]  However, this principle is not available, and malice aforethought is not negated, if the defendant by [his] [her] [unlawful] [or] [wrongful] conduct created the circumstances which legally justified [his] [her] adversary's [use of force], [attack] [or] [pursuit].]  [¶]  This principle applies equally to a person who kills in purported self-defense or purported defense of another person.]"

believed "Talada was in jeopardy at the time he hit Clindinin." (Traverse 11:23-27.)

California's claim of right defense is reserved by its terms for defendants asserting their own lawful claim to property:

> A defendant who acts **under the subjective belief that *he or she* has a lawful claim on property** lacks the required felonious intent to steal. [Citation.] A defendant need not show his mistaken claim-of-right was reasonable. An unreasonable belief that **he had a legal right to take another's property** will suffice so long as he can establish his claim was made in good faith. [Citation.]

People v. Romo, 220 Cal.App.3d 514, 518 (1990) (emphasis added); *see* People v. Tufunga, 21 Cal.4th 935, 945-50 (1999) (a good faith claim of right to title or ownership of specific property taken from another can negate the elements of felonious taking necessary to establish theft or robbery).

In its thorough reasoned decision, the Court of Appeal concluded neither instructional error nor prejudice occurred, in consideration of the totality of the jury charge. Heatley does not attack the accuracy of that court's summary, and this Court has independently verified the record:

> During closing argument, the prosecutor informed the jury that the People's only first degree murder theory was felony murder based on the underlying felonies of burglary and robbery. He argued appellant entered Clindinin's apartment with the intent to assist Talada steal from Clindinin. Defense counsel argued appellant did not have the specific intent to steal. Appellant only intended to help Talada remove her possessions from the apartment.
>
> The jury was given the standard instructions on felony murder, the elements of robbery and burglary and on aider/abettor liability. In relevant part, these instructions informed the jury that the perpetrator must have the specific intent to permanently deprive the owner of his or her property to be guilty of robbery or burglary. To be held liable as an aider or abettor, the accused must know of the unlawful purpose of the perpetrator and must have specifically intended to assist, encourage or facilitate the commission of the robbery or burglary. The jury was instructed that it could not find appellant guilty of felony murder unless it concluded the killing occurred as a causal result of the robbery or burglary.

(Lodg. 4, p. 7.)

Heatley advanced no claim of ownership or right of possession to any property in Clindinin's apartment, as evidenced by his testimony he only went to the apartment to help recover property Talada claimed belonged to her. He testified he did not even know what property was being removed, contending items were already bagged when he entered the apartment, and he did not know the contents of two pillow cases Talada handed him outside. A claim of right instruction would thus have

- 13 -

been inconsistent with his defense theory. *See* People v. Breverman, 19 Cal.4th 142, 157 (1998) ("In the case of defenses, . . .a *sua sponte* instructional duty arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case"); United States v. Bowman, 720 F.2d 1103, 1105 (9th Cir. 1983) ("a defendant is not entitled to a jury instruction on a defense theory unless there is some evidence before the jury to support it"). Absent evidence to support a particular defense instruction, no *sua sponte* duty to give it can be imputed to the court. *See, e.g.,* Hopper v. Evans, 456 U.S. 605, 611 (1982).

The Court of Appeal rejected Heatley's argument the claim of right defense should be extended to third parties like himself in his "helper" capacity "because the legal principle underlying this defense, *i.e.*, lack of felonious intent, is covered by other standard instructions." (Lodg. 4, p. 8.) "Furthermore, even if we were to assume that the claim of right defense can be applied to third parties such as appellant who did not assert a lawful claim to the contested property and to further assume that the record contains sufficient evidence to generate a *sua sponte* instructional duty, the omission is harmless under any possible standard of review." (Lodg. 4, p. 8.) The Court of Appeal reasonably found Heatley's jury "was given sufficient instructions from which it could fully and correctly analyze the defense theory that appellant honestly but mistakenly believed he was assisting Talada recover her own property," citing the specific intent elements in the robbery and burglary instructions, as well as the aider and abettor instructions requiring the defendant know of the perpetrator's unlawful purpose and intend to facilitate or assist in those crimes. (Lodg. 4, p. 8.) "If the jurors believed appellant entered Clindinin's apartment with an honest belief that he was helping Talada recover her own property, they would have acquitted him of felony murder because he did not have a specific intent to steal, did not know of Talada's unlawful purpose and did not intend to assist or facilitate a robbery or burglary." (Lodg. 4, p. 8.) Heatley's "self-serving testimony that he went to Clindinin's apartment to help Talada recover her possessions is completely unsupported by any other trial evidence." (Lodg. 4, p. 9.) He "admitted during his police interview that he went to the apartment to steal from Clindinin;" and he admitted hitting Clindinin on the head as soon as he walked out of the bedroom, before he could have manifested any credible threat to anyone in the apartment, "strong proof of

appellant's felonious intent." (Id.) Witness Blueian testified: he heard Talada, Heatley, and a third person talking about going to a person's apartment to steal from him; he saw Heatley leave Sutton's apartment carrying a long object wrapped in a sheet; Heatley told Blueian when he came back he had killed someone; and he asked Blueian to accompany him back to Clindinin's apartment to help steal a big-screen TV. (Id.) Finally, the apartment was ransacked. "In sum, the record contains overwhelming proof appellant entered Clindinin's apartment with felonious intent," raising not even a remote possibility the jury would have returned a more favorable verdict if a claim of right instruction had been given, or any derivative theory, so that "the instructional omission is harmless beyond a reasonable doubt." (Id.) It is "logical to assume that the jurors would have responded to an instruction on causation [or any other element subsumed in the charged crimes] consistently with their determination of the issues that were comprehensively explained," and would have reached the same conclusion on the defendant's mental state or intent even had the supplemental instruction been given. Henderson, 431 U.S. at 156-57.

As for Heatley's attempt to bootstrap the absence of a claim of right instruction into prejudicial foreclosure of other unrequested instructions fails along with his underlying premise. In addition, not a shred of evidence supports any reasonable inference Clindinin posed a threat to Heatley, Talada, or anyone else in the apartment at the time Heatley struck him. Moreover, he was not charged with first-degree murder requiring proof of malice aforethought, but rather felony first-degree, a charge that does do not require proof of an intent to kill. Any instruction intended to negate the element of malice, such as the killing occurred while the defendant was in fear of imminent peril (i.e., self defense) or a genuine but unreasonable fear which could reduce the crime from murder to voluntary manslaughter (i.e., "imperfect self-defense") (see Middleton v. McNeil, 541 U.S. 433, 434 (2004)) has no bearing on the elements necessary for a felony murder conviction.

The evidentiary record as a whole highlights inconsistencies even in Heatley's own versions of events over time, as is apparent from the Court of Appeal's summary of Heatley's initial interview with Detective Schiotis, reproduced above. This Court has reviewed the entirety of Heatley's trial testimony. (RT Vol. VI, pp. 1295-1461; Vol. VII, pp. 1501-1519.) The verdicts make clear the jury simply exercised its prerogative to believe the considerable evidence he acted with the state of mind

necessary for a first-degree felony murder conviction, predicated necessarily on findings he intended to commit robbery and burglary with Talada, rather than Heatley's testimony he had innocent motivation for entering Clindinin's apartment. The Court of Appeal thus reasonably found the facts on this record, a claim of right instruction was unwarranted, the outcome would have been no different had the instruction been given, and his trial was not rendered fundamentally unfair by any instructional error. Heatley cites no United States Supreme Court authority requiring a different result. Accordingly, the claim is **DENIED**.

## 2.    Ground Two:  Denial Of New Trial

In his Motion For New Trial Or To Modify Verdict, Heatley's counsel argued insufficient evidence supported the felony murder special circumstance:

> The thrust of the defense at trial was that defendant Heatley did not kill Kevin Clindinin in the course of a burglary or a robbery; that Heatley was asked by Gloria Talada to reclaim property belonging to Talada; and that the striking and accidental killing of Clindinin occurred before the taking of any property. When a felony is only incidental to a murder, a felony special circumstance will not lie. . . . Felony murder occurs only if the killing and the enumerated felony are part of one continuous transaction. . . . When the intent to steal arose only after the force was used, the offense is theft, not robbery. . . . The elements of robbery-murder special circumstances are not present if theft of the victim's property was merely incidental to a murder. . . .

(CT 615, citations to California Supreme Court cases omitted.)

Counsel moved to "dismiss the special circumstances on the ground that there is insufficient evidence to support the special circumstances of robbery and burglary," requesting "that the court reduce the verdict at least to second-degree murder," a verdict option the jury had rejected. (CT 617; *see* CT 612.) Counsel acknowledged the California legislature had "abrogated the ability of a trial court to strike a special circumstance in the interest of justice," but argued "if there's insufficient evidence to support a special circumstance," the court retains authority to strike it "because it would be a due process violation . . . for a defendant to be convicted on insubstantial evidence." (RT Vol. XI, pp. 2204-2205.) She "asked the Court to re-weigh the evidence and re-weigh the defense theory of the case, which was that my client was taking property he thought belonged to somebody else and not depriving the owner of property." (RT Vol. XI, p. 2205). Counsel attacked witness Blueian's credibility with reference to particular inconsistencies, and argued "the evidence suggests, at most,

- 16 -

second-degree murder" in consideration of Heatley's testimony he "had gone to Clindinin's apartment to help Gloria 'get her stuff back' " and his admission "he had struck Clindinin hard."  (CT 616.) Although the "prosecutor focused the jury's attention on the disarray of the crime scene" during closing argument "as evidence of a robbery and burglary," she suggests "other uncharged participants in the foray . . . may have entered with felonious intent, Heatley's entry was for the purpose of reclaiming property belonging to Talada, not for the purpose of stealing property . . . . not rob or burglarize Clindinin."  (CT 616-17.)

The People argued in opposition Heatley's felonious intent at the time he entered Clindinin's apartment was established beyond a reasonable doubt, highlighting his prior inconsistent statements to detective Shiotis, the "condition of the apartment shows that Gloria was not just removing her own property but someone searched the apartment for anything of value that could be used to barter for cash or dope," with "the most telling fact" being Heatley "struck the victim with an axe handle at a time he was supposedly only assisting Gloria Talada in removing her own property" from the apartment.  (CT 624.)  Heatley had said he was "afraid of being identified because he would go to jail," whereas had he been "doing something legal, he would not have feared jail."  (CT 624.)

In his federal Petition, Heatley argues:  "Petitioner asserts that the killing [] in this case did not occur in the course of a robbery or burglary," there was "insufficient evidence presented by the state to support this conclusion," and "the court used the wrong standard of determination."  (Pet. p. 5.)  He reasserts he "was helping recover property belonging to another and therefore lacked felonious intent" (Traverse 17:1-4), a representation incompatible with the jury's verdict.  Heatley reargues his unmeritorious theories from his Ground One jury instruction challenge.  (Traverse pp. 17-19.)  In support of the new trial claim, he cites only authority factually distinguishable from his own:  People v. Robarge, 41 Cal.2d 628, 633 (1953), for the proposition a trial court ruling on a motion for new trial "should consider the probative force of the evidence and satisfy itself that the evidence as a whole is sufficient to sustain the verdict" (Traverse 17:8-9); In re Murchison, 349 U.S. 133, 136-39 (1955), for the proposition due process requires "that a judge possess neither actual nor apparent bias" (Traverse 17:19-22); and U.S. v. Talbot, 78 F.3d 1183, 1185-86 (7th Cir. 1996), for the proposition "[f]ailure to grant a new trial aside from exhibiting bias impermissibly shifted the burden of proof to Petitioner."

(Traverse 17:20-22). Heatley identifies no instance from which judicial bias at his trial could be inferred, and his facts and circumstances bear no resemblance to those of his cited cases.

In deciding a new trial motion, a court must exercise independent judgment to answer the question "whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt," that is, whether in its opinion, "there is sufficient credible evidence to support the verdict that was reached by the jury." (Lodg. 4, pp. 10-11, *citing* People v. Taylor, 19 Cal.App.4th 836, 848-49 (1993).) The court independently "consider[s] the sufficiency of the evidence, weigh[s] the conflicts and inconsistencies and evaluate[s] the credibility of witnesses" ( People v. Price, 4 Cal.App.4th 1272, 1275 (1992)), but must be "guided by a presumption in favor of the correctness of the verdict and proceedings supporting it" (People v. Davis, 10 Cal.4th 463, 524 (1995)).

Heatley's trial court acknowledged the restriction on its authority to modify a verdict other than for insufficiency of the evidence to sustain the jury's finding, then explained the basis of its ruling:

> And I guess to summarize it quite simply, I do not find that the evidence in this case in total was insufficient to support the jury's finding for the special circumstance. It seems to me it was. I would simply note in response to the – to the motion here that the jury is not limited in their findings to matters which Mr. Heatley himself admitted doing or his admitted motives. They are entitled to consider all the evidence, which it seems to me they have done, and I believe it was sufficient, in my view, for them to arrive at the finding which they did make.

> And there's also [a] request before the Court to reduce the verdict to second degree murder. And for the same reasons that apply to the special circumstance, this is a first degree murder under the felony murder rule, given the evidence that this jury heard, in my view; and, therefore, it would be inappropriate for the Court to reduce the verdict to a second degree murder. So having said all that, the motion to reduce the verdict or modify it is denied.

(RT Vol. XI, p. 2206.)

The Court of Appeal found the trial court properly denied the motion, satisfied its use of the language "it seems to me," "I believe," "in my view," based on "the evidence that the jury heard," shows "the court independently examined the record to assess the sufficiency of the evidence supporting the jury's verdict." (Lodg. 4, p. 11.) "The court's failure to explicitly state that it was denying the motion based on its own independent weighing of the evidence 'and its use of less than artful language cannot be equated with having applied the wrong standard.' " (Id., *quoting* Price, 4

- 18 -

Cal.App.4th at 1276.)  The ample evidence to support the conviction is discussed above, defeating

Heatley's unmeritorious premise for this claim. In consideration of the entire record, rather than, as

Heatley would have it, only his own characterization of his mental state, the Court of Appeal

reasonably concluded the trial court's explanation reflects it considered all the evidence in support of

the jury's verdict and exercised its independent judgment to reach a proper result.  Heatley cites no

United States Supreme Court holding requiring a different outcome.  Accordingly, habeas relief on

this claim is **<u>DENIED</u>**.

### 3.    <u>Ground Three:  Improper Imposition Of Restitution Fine</u>

After denying Heatley's motion for a new trial or verdict modification, the court sentenced him

to life in prison without the possibility of parole for first-degree felony murder, then ordered restitution

pursuant to CAL. PEN. CODE §1202.4.[8]  (CT 629, 650-650; RT Vol. XI, pp. 2216.)

> Court is also going to order a $10,000 mandatory restitution
> fine.  You are paid moneys, as I understand it, while you're in the state
> prison, sir; and it seems to me that you should pay the maximum fine
> from those moneys that you receive between now and the end of your
> life.  In addition, I'm ordering that you pay restitution to the restitution
> fund in the sum of $2,707.11.

(RT Vol. XI, p. 2216.)

Heatley contends: "California State Prisons do not provide adequate paid work for compliance

with the legislative intent of Penal Code 1202.4," so that "the levy of restitution above the [$200]

minimum is 'cruel and unusual' as there is no reasonable expectation that Petitioner can pay this fine"

---

[8] "(b) **In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record.**  [¶]  (1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and **not more than ten thousand dollars ($10,000), if the person is convicted of a felony** . . . . [¶]  (2) In setting a felony restitution fine, the court may determine the amount of the fine as the product of two hundred dollars ($200) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted. . . .  [¶] (d)  In setting the amount of the fine pursuant to subdivision (b) in excess of the two hundred-dollar ($200) . . . minimum, the court shall consider any relevant factors including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered any losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime.  Consideration of a defendant's inability to pay may include his or her future earning capacity. A defendant shall bear the burden of demonstrating his or her inability to pay. **Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required.**  . . ." CAL. PEN. CODE §1202.4. (emphasis added).

while incarcerated. (Traverse 20:4-8.) Heatley was born in October 1958 (CT 003) and began serving his sentence in September 2004. He cites <u>United States v. Bajakajian</u>, 524 U.S. 321 (1998) (deciding the constitutionality of a criminal forfeiture of money as a penalty for defendant's failure to report he was transporting more than the statutory maximum of currency out of the United States) for the proposition Eighth Amendment proportionality analysis involves four considerations: "(1) Defendant['s] culpability; (2) the relationship between harm and penalty; (3) the penalties imposed; (4) <u>ability to pay</u>." (Traverse 20: 21-23.) Heatley he relies on three United States Supreme Court cases and one Second Circuit case in support of the claim, none of which addresses any restitution issue.

The Excessive Fines clause limits the government's power to extract payments (in kind or in cash) as punishment for some offense.[9] <u>Bajakajian</u>, 524 U.S. 321. The Eighth Amendment is implicated if a sanction has a retributive or deterrent purpose in addition to a remedial purpose. <u>United States v. Dubose</u>, 146 F.3d 1141, 1144-45 (9th Cir. 1998) (holding the similar federal Mandatory Victims Restitution Act serves both a remedial and a deterrent, rehabilitative, and retributive purpose, so that restitution under the Act is punishment implicating the Eighth Amendment), *citing* <u>Austin v. United States</u>, 509 U.S. 602, 610 (1993). "[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature." <u>Bajakajian</u>, 524 U.S. at 336, *citing* <u>Solem v. Helm</u>, 463 U.S. 277, 290 (1983). Only gross disproportionality will raise an Eighth Amendment excessive fines concern. <u>Id</u>. at 334-35 ("A punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense"), *citing, inter alia*, <u>Solem</u>, 463 U.S. at 288; *see also* <u>United States v. Mackby</u>, 339 F.3d 1013, 1016 (9th Cir. 2003).

Respondent argues Heatley's Excessive Fines claim is not cognizable on federal habeas review because it is unrelated to the petitioner's state custody, and a challenge to the fine component of a

---

[9]  Although "[f]orfeiture and restitution are distinct concepts," and "civil forfeiture analysis is inapplicable to the restitution inquiry, analysis of criminal in personam forfeiture is instructive" as a "proceeding against the wrongdoer personally and therefore constitutes punishment and a 'fine' within the meaning of the Excessive Fines Clause," unlike "the legal fiction that civil in rem forfeiture," which is "a proceeding against the 'guilty' property." <u>Dubose</u>, 146 F.3d at 1145, *citing* <u>Bajakajian</u>, 524 U.S. at 333-34.

sentence is not rendered cognizable simply because the petitioner is in custody.[10]  In any event,

Respondent argues the claim is procedurally defaulted, based on the only reasoned state court decision

to address the issue, the May 21, 2007 Fresno County Superior Court Order denying Heatley's petition

for writ of habeas corpus.  (Answer pp. 9-11; Lodg. 8.)  Heatley neither appealed the restitution

component of his sentence nor did he object at sentencing.  (RT Vol. XI, pp. 2216-2218); *see* People

v. Nystrom, 7 Cal.App.4th 1177 (1992) (failure to object forfeits the right to appeal, and there is no

basis to complain regarding the amount of the fine when it does not exceed the maximum where no

prejudice appears).  Even were the court to reach the merits, Respondent contends the claim fails, as

the state court also found.

Heatley attempts "to overcome any procedural bar" on grounds he did not know at the time of

sentencing or direct appeal the limitation on "actual employment opportunities" in prison, nor of the

alleged "disregard of the legislative intent by the California Department of Corrections in that

restitution would be taken from sources not directly earned by Petitioner and finally but not limited

to the current ongoing economic crisis," purportedly resulting in a "fundamental miscarriage of

justice."[11]  (Traverse 22:2-14.)  He asserts the restitution order "is excessive based on his ability to

---

[10]  "Although the Ninth Circuit has not yet decided the issue except in an unpublished opinion [Tuggle v. Campbell, 2007 WL 4513575 (9th Cir. Dec. 21, 2007), *cert den. sub nom* Tuggle v. Kramer, 129 S.Ct. 86 (U.S. Oct. 6, 2008) (holding it lacked jurisdiction to review a state habeas petitioner's disproportionate fine claim because fines do not meet the custody requirement of § 2254, even though the petitioner also asserted cognizable claims)], other circuits have concluded that being in physical confinement does not confer jurisdiction under 28 U.S.C. § 2254 to review other, non-custodial components of a sentence."  Patterson v. Mendoza-Powers, 2008 WL 2339820 * 2 (N.D. Cal. June 5, 2008), *discussing* Virsnieks v. Smith, 521 F.3d 707, 719-22 (7th Cir. 2008), *cert. den*., 129 S.Ct. 161 (U.S. Oct. 6, 2008).  While not binding on this Court, the Patterson court concluded it lacked jurisdiction to consider the petitioner's challenge to the restitution fine because "he does not satisfy the habeas custody requirement."  Id at *4.  *See also* United States v. Kramer, 195 F.3d 1129, 1129-30 (9th Cir. 1999) (holding federal petitioners in custody cannot challenge fines or restitution orders under § 2255, even if the petition also contains cognizable claims for release from custody, denying a federal defendant's motion to vacate a restitution order because "[b]y its plain terms, § 2255 [like § 2254, despite certain textual distinctions] is available only to defendants who are in custody and claiming the right to be released"); Kaminski v. United States, 339 F.3d 84, 89 (2d Cir. 2003) ("Collateral relief from noncustodial punishments is not made more readily available to a petitioner just because that petitioner happens at the time to be subject also to custodial penalties").

[11]  With respect to Heatley's contention restitution payments can only be collected from his earnings while in the state prison system, the argument raises no cognizable federal habeas issue as it does not challenge the legality of his custody nor does it seek a determination of his entitlement to an earlier or immediate release. 28 U.S.C. § 2254(a); *see* Preiser v. Rodriguez, 411 U.S. 475, 500 (1973).  Moreover, he is mistaken under state law.  "[T]he collection of restitution fines from trust accounts of California inmates" is governed by CAL. PEN. CODE § 2085.5, "which authorizes restitution be collected from inmates' trust account deposits, regardless of

pay and deni[es] . . . due process."[12]  (Traverse 19:4-6; Pet. p. 6.)

On the issue of procedural default, in its reasoned decision, the Fresno County Superior Court first observed the "general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction." (Lodg. 8, 2:3-8, *quoting* Ex Parte Dixon, 41 Cal.2d 756, 759 (1953).) *See* Park v. California, 202 F.3d 1146 (9th Cir. 2000) ("In California, a convicted defendant desiring to bring claims in a state habeas petition, must, if possible, have pursued the claims on direct appeal from his conviction"). California's Dixon rule generally precludes state habeas relief on claims not pursued on direct appeal, but recognizes an exception for fundamental constitutional errors. Dixon, 41 Cal.2d at 759. Federal habeas review is unavailable when the state courts' denial of relief is predicated on an adequate state law ground independent of the federal claim. *See* Washington v. Cambra, 208 F.3d 832 (9th Cir. 2000) (discussing the Dixon rule and holding "the Dixon rule does not provide an 'independent' state law basis for denying a habeas petition" *if* the petition was filed before In re Robbins, 959 P.2d 311, 340 n.34 (1998) *and* the petition "raises fundamental constitutional errors"). The Washington petitioner sought federal habeas relief before the Robbins decision. Heatley filed after Robbins, permitting a finding the citation to Dixon constitutes an adequate and independent state law grounds for denial of the claim. However, the Superior Court also reached the merits of Heatley's restitution challenge. Interpreting state law, that court determined:

> [T]o the extent that petitioner argues that the trial court failed to make an express finding that petitioner had the ability to pay the restitution fine, the trial court was not required to make such a finding. Penal Code section 1202.4 imposes no such requirement, and courts cannot impose a requirement of an express finding of ability to pay by way of judicial fiat. (Penal Coder § 1202.4(d), "Express findings by

the source." Johnson v. Tilton, 2008 WL 108972 *1 (U.S. Dist. Ct., E.D. Cal., Jan. 7, 2008). His further argument "restitution is part of Petitioner's custody as it affects every facet of the incarceration time imposed" (Traverse 19:7-8) appears to this court to challenge a condition of confinement not cognizable under habeas review standards. *See* Ramirez v. Galaza, 334 F.3d 850, 859 (9th Cri. 2003) ("[U]nder Preiser, habeas jurisdiction is proper where a challenge to prison conditions would, if successful, necessarily accelerate the prisoner's release," holding "habeas jurisdiction is absent, and a [42 U.S.C.] § 1983 action proper, where a successful challenge to a prison condition will not necessarily shorten the prisoner's sentence").

[12] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

the court as to the factors bearing on the amount of the fine shall not be required,"; People v. Frye (1994) 21 Cal.App.4th 1483, 1485.) Rather, the reviewing court will presume that the trial court has performed its official duty. (People v. Frye, *supra*, at 1486.) An implied finding of ability to pay is sufficient to support the judgment, and the trial court may consider the defendant's future wages eared while incarcerated in determining that the defendant has the ability to pay the fine. (Id. at 1487; Penal Code § 1202.4(d).) Here the trial court apparently found that petitioner had the ability fo pay based on his anticipated future earnings while incarcerated. There does not appear to be any basis for overturning the trial court's decision.

Finally, it appears that the amount of the fine was reasonable under Penal Code section 1202.4(b)(2). "In setting a felony restitution fine, the court may determine the amount of the fines as the product of two hundred dollars ($200) **multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted**." (*Ibid.* [emphasis added].) Here, petitioner was convicted of first degree murder, burglary, robbery, and use of a deadly weapon, and sentenced to life without parole [while in aged in his early forties]. Thus, imposing a fine of $10,000 was not unreasonable based on the length of the sentence and the number of felony counts.

(Lodg. 8, pp. 2-3; *see* RT Vol. XI, p. 2216 (matters expressly considered by the trial court in determining Heatley should be required to "pay the maximum fine from those moneys that you receive between now and the end of your life").

Federal habeas courts do not re-examine state court determinations on state law issues. *See, e.g.*, Himes, 336 F.3d at 852. The restitution fine imposed did not exceed the statutory maximum, and the repayment period extends for the duration of his incarceration, a period coextensive with the rest of his life, over which term he is likely to satisfy the restitution component of his sentence under the statutory recovery formula from his prison account funded by earnings and other deposits. *See* CAL. PEN. CODE §1202.4.(b); *see also* fn 11, above. Imposition of the maximum fine accordingly is not grossly disproportionate to his offense and custodial sentence. Heatley has shown no fundamental miscarriage of justice associated with the restitution portion of his sentence. He has not demonstrated the state courts resolved that claim in a manner contrary to or by unreasonably applying any United States Supreme Court holding or unreasonably found the facts. 28 U.S.C. § 2254(d). Accordingly, federal habeas relief on this claim is **DENIED**.

## III.   CONCLUSION AND ORDER

For all the foregoing reasons, **IT IS HEREBY ORDERED** Heatley's federal habeas petition

is **<u>DENIED</u>** in its entirety, and judgment shall be entered terminating this action with prejudice.

**IT IS SO ORDERED**.

DATED:  April 6, 2009

_____
M. James Lorenz
United States District Court Judge